118    205
s76ɴᴡ  407
130    292

118    205
s76ɴᴡ  407
133    323

## BROWN v. ANN ARBOR RAILROAD CO.

Mᴀsᴛᴇʀ ᴀɴᴅ Sᴇʀᴠᴀɴᴛ — Cʜᴀɴɢᴇ ᴏꜰ Eᴍᴘʟᴏʏᴍᴇɴᴛ — Uɴᴋɴᴏᴡɴ Dᴀɴɢᴇʀ — Dᴜᴛʏ ᴛᴏ Wᴀʀɴ — Uɴᴄᴏᴠᴇʀᴇᴅ Hᴀᴛᴄʜᴡᴀʏ.

A servant who is taken temporarily from the work for which he is regularly employed, and is set to doing work of a different kind, in a strange place, has a right to assume, in the absence of any caution or warning, that there are no circumstances unknown to him, and known to the master, which render his new place of work unusually dangerous. So held, where an oiler on a ferryboat, in which the hatchways were always covered when not in use, was directed to perform a different kind of work on another boat, which was out of commission, without his knowing or being informed of a custom of leaving the hatchways open on boats out of commission.

Error to Benzie; Aldrich, J.    Submitted June 7, 1898. Decided September 27, 1898.

Case by Jacob Brown against the Ann Arbor Railroad Company for personal injuries.    From a judgment for defendant on verdict directed by the court, plaintiff brings error.    Reversed.

*Smurthwaite & Fowler*, for appellant.

*T. W. Whitney* (*Alexander L. Smith*, of counsel), for appellee.

Lᴏɴɢ, J.    This action was brought to recover damages

for injuries sustained by plaintiff, occasioned, it is claimed, by the negligence of the defendant. The case was tried before a jury, and at the close of the testimony the court directed the verdict in favor of defendant. In this we think the court was in error. It appears that the plaintiff was employed by one Thomas Cosgrove, the chief engineer of the defendant, in charge of its car ferryboat the "Ann Arbor No. 2," in September, 1896. Plaintiff was paid at first the sum of $20 per month. His work at that time was passing coal. In January following he was given the work of oiling the machinery, and his pay increased to $30 per month. He was under the direction of Mr. Cosgrove, by whom he was hired, and who directed his work and movements. He continued in this work until March 14, 1897. On that day another of defendant's boats, called the "J. C. Ford," was laid up at what was called "Woodward's Dock," in the same harbor where the Ann Arbor lay. The Ford was out of commission. Mr. Cosgrove called the plaintiff to go with him to the Ford, and assist in putting her in condition to go into commission. A man from "Ann Arbor No. 1" was also called by Mr. Cosgrove to go with them. Arriving at the Ford, the parties went down into the fire-hole by a ladder, and there attempted to go through into the engine-room. Finding they could not get through that way, Mr. Cosgrove told plaintiff to take the keys which he handed him, and "go up on deck, and get into the engine-room in some other way." Plaintiff testified, in reference to his going towards the engine-room, as follows:

"When I went up there, I could not see any way to get down, only to go forward. I did not know any other way. There was a way of going down forward through a companion-way right down next to the boiler-house there. That stairway led down to the lower deck. There were two decks. The Ford is a freight boat, with a double deck. When I got down between the decks it was dark. I knew pretty near where the engine-room was. I did not know exactly. I had never been through the boat before. I had never before that time been through any

steamboat that was laid up and out of commission. I had never worked upon a steamboat at any time, except passing coal and greasing on the No. 2. When I landed between decks, I proceeded towards the engine-room. Mr. Cosgrove said, 'Go into the engine-room stairway,' and we would get some lights and set up the engine. I went down through there, and went just as carefully as I could walk,—slow; and I thought I was all right, and was going over to the left-hand side, and I walked right into this big hatchway. I could not see. There was no chance for me to see that hatchway at that time. The hatchway was wholly uncovered, and no coaming around it; just as level as the floor. · I fell 12 to 16 feet. I broke my leg twice in two, and got a cut over the eye, and one hand was injured so I could not use it."

Cosgrove and others soon came to him and took him away.

Plaintiff further testified that he did not know anything about the various hatchways prior to receiving the injury, or the hatchways of any other steamer than the Ann Arbor No. 2. It appeared from other testimony in the case offered by plaintiff that the car ferry Ann Arbor No. 2 and other ferries have gratings over the hatchways. The hatchway on the Ford, through which the plaintiff fell, was about three feet aft of the boiler-house, and was uncovered. The superintendent of the defendant's water line, Capt. William Robertson, testified that, while the Ford was laid up, the hatches were ordered off to give ventilation to keep the boat dry. Plaintiff testified that he did not know of the custom to keep the hatchways on boats open when out of commission. Plaintiff further testified that he was not told by Mr. Cosgrove or any other person that the hatchways of the Ford were open, and knew nothing about it; that he never saw any open hatchways that were not covered by a grating, unless they were receiving or discharging freight through them. Mr. Cosgrove was not called as a witness.

It is averred in the declaration that it was the duty of the defendant, under the circumstances, to inform the plaintiff that these hatchways were open. The court below, in directing the verdict, stated to the jury that—

"The leaving the hatchways open was not an act of negligence, and, for the plaintiff to recover, it would seem to me to be necessary for the plaintiff to show that the person directing him  *  *  *  to go through this boat, where these open hatchways existed,—that the person who directed him to go there,—had a superior knowledge to himself as to the condition of the boat; which has not been done in this case."

Capt. Robertson testified that Mr. Cosgrove had charge of this work. He was chief engineer of the defendant, had hired the plaintiff and directed all his movements, and from this record it appears he stood in place of the master. He called the plaintiff from the work in which he was regularly employed, and sent him into a place of danger, without any caution that he might expect an open hatchway. From his position there, it must be presumed that Mr. Cosgrove knew it was the custom of the defendant to leave the hatchways open while the freight boat was out of commission. The plaintiff did not know this. He had been but a short time employed on a boat, and was wholly unacquainted with freight boats, or the custom of leaving the hatchways open on such boats. He was employed as an oiler of engines on the Ann Arbor. He was taken away from his accustomed work, and, if his testimony be true, put into a dangerous place, without warning or caution, by one who stood in place of master. It is true that the rule is well settled that the servant assumes all the risks usually incident to his employment, but this rule cannot be invoked in the present case. His usual work, for which he was employed, was that of oiler; and that on another and different kind of boat. He was taken from that work, and put to do work of another kind. Plaintiff had the right to assume that he would not be put in a position of danger, in going upon the boat to aid in fitting her out. *Harrison* v. *Railroad Co.*, 79 Mich. 409 (19 Am. St. Rep. 180); *Engel* v. *Smith*, 82 Mich. 1 (21 Am. St. Rep. 549).

The court below was in error in taking the case from the jury. The question of the defendant's negligence, as

well as the negligence of the plaintiff, should, under the circumstances here, have been submitted to the jury.

Judgment is reversed, and a new trial ordered.

The other Justices concurred.